*Francois Browne v. State of Maryland*, No. 2, September Term, 2023.

**EVIDENCE – MD. RULE 5-404(b) – RULE OF EXCLUSION**

Under Maryland Rule 5-404(b), evidence of other crimes, wrongs, or other acts ("other bad acts") is not admissible to prove the character of a person to show action in conformity therewith. The proffering party bears the burden of showing that the evidence is specially relevant to a contested issue in the case other than propensity.

**EVIDENCE – MD. RULE 5-404(b) – IDENTITY AND *MODUS OPERANDI***

Evidence of other bad acts may be admissible under Maryland Rule 5-404(b) to prove the identity of the accused as the perpetrator of a charged crime if the evidence shows a certain *modus operandi* attributable to the accused was used in the charged crime and other crimes to which the accused is connected. In this case, that the accused was convicted of the fatal beating of a child several years prior did not amount to a *modus operandi* allowing the inference that the same person also fatally beat the child victim in this case.

**EVIDENCE – MD. RULE 5-404(b) – CONTESTED ISSUE**

Evidence of other bad acts may be admissible only if, among other requirements, it is relevant to some genuinely contested issue in the case other than the defendant's propensity to commit crime. Whether an issue is "contested" is determined in the context of the evidence presented and the arguments made. Here, where: (1) the defendant affirmatively disavowed an intent to rely on a defense of accident; (2) the defendant did not raise any defense or assertion of accident at trial; and (3) expert witnesses for the State and the defendant agreed that the victim's death was a homicide caused by blunt force trauma, lack of accident was not a genuinely contested issue in the case.

**EVIDENCE – MD. RULE 5-404(b) – DOCTRINE OF CHANCES**

Other bad acts evidence is inadmissible under Maryland Rule 5-404(b) when offered to show propensity to commit crime. The "doctrine of chances" theory, under which other bad acts evidence is said to be specially relevant based on the objective unlikelihood that two similar events occurred by chance, as opposed to through human intervention, is not an independent theory of special relevance. Here, where the State sought to show that because the defendant was previously convicted of a similar intentional crime, it is objectively unlikely that the defendant was not responsible for the intentional crime charged, that is impermissible propensity reasoning. Accordingly, the circuit court abused its discretion in admitting the other bad acts evidence at issue.

Circuit Court for Baltimore City
Case No. 118232001
Argued: September 8, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 2

September Term, 2023

_____

FRANCOIS BROWNE

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Fader, C.J.
Watts, J., dissents.

_____

Filed: November 28, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

Maryland Rule 5-404(b) generally renders inadmissible evidence of a defendant's "crimes, wrongs, or other acts" other than those for which the defendant is on trial ("other bad acts"), if offered for the purpose of proving the defendant's propensity to engage in criminal or wrongful acts. The Rule also expressly recognizes that such evidence is admissible if offered for other purposes. In this case, we explore when certain other bad acts evidence qualifies for admission for purposes other than propensity.

Petitioner Francois Browne was tried for murder and child abuse in connection with the death of his girlfriend's 17-month-old child. During the trial, over Mr. Browne's objection, the Circuit Court for Baltimore City permitted the State to introduce evidence that, five years earlier, Mr. Browne had pled guilty to child abuse resulting in the death of his own infant son. Mr. Browne contends that the evidence should have been excluded pursuant to Rule 5-404(b). We agree. The evidence of Mr. Browne's prior conviction was not relevant to any non-propensity issue that was in genuine dispute in the case. Accordingly, the circuit court erred in admitting it, and we must reverse and remand for a new trial.

In reaching our holding, we reaffirm the following two points established by our caselaw. First, evidence of a defendant's other bad acts is inadmissible to prove the defendant's propensity to engage in criminal or wrongful acts. *See, e.g.*, *Burris v. State*, 435 Md. 370, 385 (2013); *Wynn v. State*, 351 Md. 307, 316 (1998); *Harris v. State*, 324 Md. 490, 496 (1991); *State v. Faulkner*, 314 Md. 630, 633 (1989). Second, evidence of a defendant's other bad acts is admissible if (and only if): (a) the evidence is offered for a non-propensity purpose that is relevant to a genuinely disputed issue in the case; (b) the

defendant's involvement in the other bad acts is established by clear and convincing evidence; and (c) the need for and probative value of the evidence is not substantially outweighed by any unfair prejudice likely to result from its admission. *See, e.g.*, *Burris*, 435 Md. at 386; *Wynn*, 351 Md. at 317; *Harris*, 324 Md. at 498; *Faulkner*, 314 Md. at 634-35.

## BACKGROUND

### A. *Factual Background*[1]

This case arises out of the horrific death of 17-month-old Zaray Gray on the evening of Wednesday, July 18, 2018. That morning, Mr. Browne went to the Baltimore home of Whitney West, his then-girlfriend of roughly two months and Zaray's mother. Mr. Browne had breakfast with Ms. West, Zaray, and Zaray's two siblings, then approximately six and seven years old.[2]

After breakfast, Mr. Browne took all three children on a walk to a nearby playground while Ms. West stayed home. Two events that occurred during the trip to the playground played a role at trial. First, at one point, Zaray fell off the bottom of a slide and onto woodchips that covered the surface of the playground. Mr. Browne mentioned the fall in responding to questions about the day's events during a police interview. Mr. Browne did

---

[1] The facts presented in this section are based on the testimony and other evidence introduced at trial.

[2] Zaray's siblings were seven and eight years old, respectively, at the time of trial, which took place approximately 13 months after Zaray's death. We will not name Zaray's siblings in this opinion in consideration of their privacy.

not state that Zaray was hurt by the fall, and Zaray's siblings both testified at trial that Zaray did not cry or appear hurt by it. Second, one of Zaray's siblings testified that he saw Mr. Browne "yanking" Zaray's arm as they were all leaving the playground. The sibling saw Zaray crying and making a "weird" face at the time.[3]

After being gone for roughly 30-45 minutes, Mr. Browne and the children arrived back at the West house. Shortly after Mr. Browne returned Zaray to Ms. West, Zaray vomited for the first time that day. Mr. Browne cleaned and changed Zaray before Ms. West put him down on her bed.

Around 4:00 p.m., Ms. West left the home with one of the other children, leaving Zaray and the other sibling with Mr. Browne. Zaray vomited twice more while Ms. West was gone. After the second time, Mr. Browne bathed and changed Zaray and put him on Ms. West's bed. Mr. Browne then went back downstairs and told Zaray's sibling to check on Zaray occasionally, which the child did.

Ms. West returned home sometime between 6:00 p.m. and 7:00 p.m. to find Mr. Browne downstairs on the couch and Zaray upstairs sleeping. When she went upstairs, Zaray was sleeping on his stomach and moaning in his sleep. After dinner, Ms. West again went upstairs to shower. When she returned to her room to change Zaray, she discovered

---

[3] The two siblings provided slightly different accounts of their trip home. According to the one who testified about Mr. Browne "yanking" Zaray's arm, all three siblings and Mr. Browne walked home after that. According to the other, Mr. Browne and Zaray took a shortcut to get home while the other two siblings returned the same way they had come. The difference is not material to our resolution of this appeal.

he would not wake up and did not have a pulse. An ambulance took Zaray to the hospital, where he was pronounced dead at 10:35 p.m.

In August 2018, Mr. Browne was indicted for second-degree murder, first-degree child abuse resulting in death, and other crimes related to Zaray's death. Zaray's autopsy showed extensive injuries in his abdomen. At trial, both sides presented expert medical testimony. The State's expert testified that Zaray's death was caused by multiple injuries inflicted by blunt force trauma, and that his manner of death was homicide. The medical expert for the defense agreed on both points. The experts also agreed that Zaray's death resulted from acute injuries that had been inflicted relatively recently, with the State's expert testifying that the fatal injuries had occurred "within hours" of death and the defense expert testifying that they had occurred either the day of death or possibly the day before. Both experts also testified that Zaray had suffered older blunt force injuries to his abdomen and other parts of his body. The State's expert testified that those older injuries had occurred within days, not weeks, before death, while the defense expert testified that the older, non-fatal injuries could have occurred "weeks to months" earlier.

### B.      Procedural Background

### 1.      Motion in Limine

The State filed a motion in limine seeking to introduce evidence of "other child abuse involving other victims based on the objective improbability that [Mr. Browne] would be innocently enmeshed in suspicious circumstances so frequently." The State sought to introduce evidence of two prior incidents of death or injury to children involving

4

Mr. Browne. First, the State sought to introduce evidence concerning the death of seven-month-old Kendall Browne, Mr. Browne's son, in January 2013. According to the State, Kendall was hospitalized on December 31, 2012 after suffering cardiac arrest and was subsequently diagnosed with a subdural brain hematoma, anoxic brain injury, retinal hemorrhages, and rib fractures. Mr. Browne, who had only recently begun unsupervised visits with Kendall, had taken care of the infant from the evening of December 29, 2012, when he was dropped off in good health, until the incident occurred. Kendall died shortly thereafter, and his death was ruled a homicide caused by multiple blunt force head injuries. Mr. Browne was subsequently indicted and tried on second-degree murder and other charges arising from Kendall's death. After two mistrials and an acquittal on the second-degree murder charge, Mr. Browne entered an *Alford* plea to first-degree child abuse resulting in death.[4]

Second, the State sought to introduce evidence concerning an injury to a three-month-old child, K.O., in November 2017, when Mr. Browne was dating the child's mother. K.O. was diagnosed with an acute transverse femur fracture, an injury that would occur from compressive forces, as well as compressive fractures to several ribs, some of which were less than a few days old and others more. At the time, K.O.'s mother stated that Mr. Browne had stayed at the house on multiple occasions over the two weeks before

---

[4] An *Alford* plea is a guilty plea in which a defendant concedes that there is sufficient evidence for a jury to find guilt beyond a reasonable doubt but does not admit to committing the crime. *Smith v. State*, 484 Md. 1, 23-24 (2023).

the child's injuries were diagnosed, that K.O. cried when with Mr. Browne, that she had observed Mr. Browne holding K.O. by the ribs, and that she had also observed Mr. Browne handling the child's leg shortly before she noticed that it was swollen. Although Mr. Browne was investigated for possible child abuse, he was not charged in connection with K.O.'s injuries.

The State argued that both incidents were relevant to Mr. Browne's trial for two permissible purposes under Rule 5-404(b). First, the State contended that, pursuant to a theory known as the doctrine of chances, it was objectively improbable that all three instances would have happened innocently, thus negating the possibility that Zaray's death was an accident or a mistake and establishing Mr. Browne as the wrongdoer. Second, the State argued in the alternative that the evidence was relevant to prove Mr. Browne's identity as Zaray's killer because the circumstances surrounding the three incidents were so similar that they illustrated a common *modus operandi*.

On the first point, Mr. Browne responded that other bad acts evidence may be introduced to show absence of accident or mistake only when the defendant admits the act at issue but claims "that he [acted] accidentally or by mistake," and that Mr. Browne "has made and is making no such assertion and raising no such defense." Mr. Browne specifically disavowed any intent to argue that Zaray "might have sustained significant injury" as a result of the fall from the playground slide. With respect to the *modus operandi* theory, Mr. Browne argued that the other incidents had "to be nearly identical" to the charged conduct to be admissible on that basis, and that here, they were not. Thus,

6

Mr. Browne argued, the evidence was not relevant for any purpose other than the impermissible one of showing Mr. Browne's propensity to commit crime.

Following a hearing, the court granted the State's motion with respect to evidence of Kendall's death, finding that it was relevant to show Mr. Browne's "intent and knowledge," to establish his identity as Zaray's killer, and to rebut any indication that Zaray's death was an accident. The motions court found that whether an accident occurred was genuinely contested because Mr. Browne had told the police that Zaray had fallen off the slide. The court also concluded that the State had satisfied the other criteria for admission, including proof of the incident by clear and convincing evidence and that any risk of unfair prejudice did not substantially outweigh the need for and probative value of the evidence. By contrast, the court concluded that the State could not introduce evidence concerning the alleged abuse of K.O. because the State had not met its burden of producing clear and convincing evidence that the abuse had occurred.

### 2.    *Trial*

The State's presentation of evidence at Mr. Browne's trial took approximately three days. The State spent the better portion of one of those days providing the details of Kendall's death. The State's presentation of evidence included the direct examination of two witnesses, a police sergeant who investigated the crime and the doctor who performed Kendall's autopsy, as well as the introduction of medical records and other documents. The evidence was consistent with the State's proffer in connection with its motion in limine as described above, including that Kendall had died of multiple injuries, the most serious

7

of which were to the head, that his injuries resulted from blunt force trauma, and that the manner of death was homicide.

The jury found Mr. Browne guilty of second-degree murder and first-degree child abuse resulting in Zaray's death. Mr. Browne noted an immediate appeal.

### 3. *Motion for New Trial*

Approximately a year after trial, Mr. Browne's appellate counsel discovered that digital copies of two videos that were not admitted into evidence at trial had been included on a disk that was provided to the jury along with all of the admitted exhibits. The disk, marked State's Exhibit 3, was inadvertently sent to the jury room after it was substituted for the original Exhibit 3 disk during trial. The unadmitted videos included a recording of a formal police interview with Zaray's father, Denardo Gray, and body-worn camera footage from a detective's visit to Ms. West's home to recover evidence six days after Zaray's death. The record contains no indication that the jurors played, viewed, or otherwise became aware of the unadmitted videos.

In January 2021, Mr. Browne filed a motion for a new trial on the ground that the existence of the disk in the jury room constituted newly discovered evidence warranting a new trial. The trial court denied the motion, finding that defense counsel had not acted with due diligence because if counsel had checked the disk before it had been sent to the jury, as the court had instructed counsel to do, "the error would have been easily found and corrected." Mr. Browne appealed that ruling as well.

8

### 4.      Decision of the Appellate Court of Maryland

The Appellate Court consolidated the two appeals, and ultimately affirmed in an unreported 2-1 opinion. *Browne v. State*, No. 1892, Sept. Term 2019, No. 0495, Sept. Term 2021, 2022 WL 17490062, at *40, 50 (Md. App. Dec. 7, 2022). The Appellate Court held that the evidence of Kendall's death was admissible under the doctrine of chances. *Id.* at *40. The court treated that doctrine as an independent theory of relevance that allowed the State to bypass the requirements of Rule 5-404(b) and this Court's test for the admissibility of "other bad acts" evidence set forth in *State v. Faulkner*, 314 Md. 630 (1989), and its progeny. *Browne*, 2022 WL 17490062, at *40. According to the intermediate appellate court, that test was inapplicable because the "focus" of attention under the doctrine of chances is the objective improbability of the occurrence of events, not the defendant's character. *Id.* at *40. The Appellate Court stated that, "as an alternative or back-up holding," the evidence of Kendall's death was also admissible to show identity and absence of accident or mistake, although the majority opinion did not provide any analysis or explanation on that point. *Id.*

The Appellate Court also affirmed the trial court's denial of Mr. Browne's motion for a new trial. *Id.* at *50. The court agreed with the trial court that Mr. Browne did not satisfy the standard for a new trial based on newly discovered evidence because he had failed to exercise due diligence in discovering the unadmitted videos on the disk. *Id.*

In dissent, Judge Arthur would have held that the evidence of Kendall's death was inadmissible under Rule 5-404(b). *Id.* at *50-51 (Arthur, J., dissenting). The dissent

9

reasoned that the evidence was not relevant to establish a *modus operandi* because although there may be some generic similarities between Kendall's and Zaray's deaths, the circumstances were not so similar as to allow the inference that the same person killed both children. *Id.* at \*58. Judge Arthur also concluded that the evidence was not admissible to show an absence of accident because whether Zaray died by accident was not genuinely in dispute at trial. *Id.* at \*61. As to the doctrine of chances, Judge Arthur determined that the theory did not support Mr. Browne's identity as the perpetrator except through impermissible propensity reasoning. *Id.* at \*68. Because Judge Arthur would have reversed the conviction and granted Mr. Browne a new trial on those grounds, he did not reach the issue of the trial court's resolution of the motion for a new trial. *Id.* at \*72.

Mr. Browne filed a petition for a writ of certiorari, which we granted. *Browne v. State*, 483 Md. 265 (2023).

## DISCUSSION[5]

Evidence of other bad acts is admissible only if: (i) it is relevant to some contested issue in the case other than the defendant's propensity to commit crime; (ii) proven by clear

---

[5] The petition for a writ of certiorari asks this Court to decide six questions, the first four of which concern the admissibility of the other bad acts evidence. Those questions include whether the Appellate Court was correct to consider departing from the traditional analysis under Rule 5-404(b) without briefing on the issue; whether the Appellate Court's refashioned analytical framework should be adopted by this Court; whether the Appellate Court erred in recognizing the doctrine of chances theory and applying it in this case; and whether the trial court erred and abused its discretion in admitting the evidence of Kendall's death. We will address and resolve the admissibility of the other bad acts evidence using our well-established framework, which we reaffirm in this opinion, and which will render it unnecessary to reach the other questions concerning the Appellate

and convincing evidence; and (iii) where the need for and probative value of the evidence is not outweighed by the risk of unfair prejudice. *Faulkner*, 314 Md. at 634-35. The State argues that the evidence it introduced concerning the death of Kendall was relevant to three contested, non-propensity issues: (1) Mr. Browne's identity as the perpetrator, by revealing a *modus operandi* demonstrating that the same individual committed both crimes; (2) whether Zaray's death was caused by an accident; and (3) Mr. Browne's identity as the perpetrator, by showing the objective improbability of him being innocently involved in the deaths of two infants by blunt force trauma. We will begin with an overview of the well-established framework Maryland courts apply to other bad acts evidence and then address each of the State's theories in turn.

## I. MARYLAND RULE 5-404(B)

### A.     *Legal Background and Analytical Framework*

"Maryland Rule 5-404(b) embodies the common law rule of 'other crimes evidence.'" *Merzbacher v. State*, 346 Md. 391, 406 (1997). The Rule states:

> Evidence of other crimes, wrongs, or other acts . . . is not admissible to prove the character of a person in order to show action in the conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, absence of mistake or accident, or in conformity with Rule 5-413.

---

Court's approach. The fifth and sixth questions presented address the motion for a new trial, asking both what "due diligence" requires in the context of Rule 4-331(c) and whether the trial court abused its discretion in denying the motion for a new trial based on newly discovered evidence. Because we will order a new trial based on the improper admission of the other bad acts evidence, we will not reach Mr. Browne's questions regarding the motion for a new trial.

11

Md. Rule 5-404(b). Each sentence of the Rule serves a different function. The first provides that other bad acts[6] evidence is inadmissible when it is offered "to suggest that because the defendant is a person of criminal character, it is more probable that [the defendant] committed the crime for which [the defendant] is on trial." *Streater v. State*, 352 Md. 800, 806 (1999) (quoting John W. Strong, McCormick on Evidence § 190, at 798 (4th ed. 1992)). The second sentence clarifies that, notwithstanding the inadmissibility of other bad acts evidence to prove propensity, such evidence "may be admissible for other purposes," including, but not limited to, the enumerated purposes. Md. Rule 5-404(b).

The rationale behind the exclusion of other bad acts evidence when it is offered to show propensity is not that such evidence is irrelevant or has no "probative force." *Harris v. State*, 324 Md. 490, 495-96 (1991). To the contrary, such evidence has "admitted probative value." *Michelson v. United States*, 335 U.S. 469, 476 (1948). Rather, the Rule is "grounded in the reality that 'substantive and procedural protections are necessary to guard against the potential misuse of other crimes or bad acts evidence and avoid the risk that the evidence will be used improperly by the jury against a defendant.'" *Burris v. State*, 435 Md. 370, 385 (2013) (quoting *Streater*, 352 Md. at 807). Such evidence is thus "excluded because it may tend to confuse the jurors, predispose them to a belief in the defendant's guilt, or prejudice their minds against the defendant." *Terry v. State*, 332 Md.

---

[6] As we have previously observed, the Rule does not require that the other acts at issue be "bad." *Klauenberg v. State*, 355 Md. 528, 547 n.3 (1999). We nonetheless use the phrase "other bad acts" for simplicity.

329, 334 (1993). The overarching concern is that the jury may use evidence of crimes that are not the subject of the trial "to conclude that the defendant is a 'bad person' and, therefore, should be convicted of the charges for which [the defendant] is on trial" for that reason, rather than based on evidence specific to those charges. *Wynn v. State*, 351 Md. 307, 317 (1998); *see also Michelson*, 335 U.S. at 476 ("[Other bad acts evidence] is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny [the defendant] a fair opportunity to defend against a particular charge."); *Straughn v. State*, 297 Md. 329, 333 (1983) (stating that evidence of other bad acts is excluded because "if a jury considers a defendant's prior criminal activity, it may decide to convict and punish [the defendant] for having a criminal disposition" and because "a jury might infer that because the defendant has committed crimes in the past, [the defendant] is more likely to have committed the crime" at issue).

With that overarching concern in mind, in *Harris* we considered how the Rule should operate mechanically. 324 Md. at 494-95. We weighed the merits of an "inclusionary" approach to the Rule, in which other bad acts evidence is presumptively admissible unless the party opposing it demonstrates that it is offered to show propensity, versus the "exclusionary" approach, in which such evidence is presumptively inadmissible unless the party offering it proves that it is offered for some non-propensity reason. *Id.* We concluded that the exclusionary approach offers the best balance between appropriate concerns for potential unfair prejudice from the introduction of other bad acts evidence, on

13

the one hand, and the risk of excluding evidence possessing special relevance that outweighs the potential for unfair prejudice, on the other. *Id.* at 499-500. We reasoned:

> By stating the rule in exclusionary form—evidence of other bad acts is generally not admissible—followed by an exception for those instances in which the evidence 1) has special relevance, i.e. is substantially relevant to some contested issue in the case and is not offered simply to prove criminal character, and 2) has probative force that substantially outweighs its potential for unfair prejudice, the focus is correct, and the burden is where it belongs.

*Id.* at 500. We further explained that the choice of the exclusionary approach was "most likely to produce a just result" because that approach would "ensure that adequate consideration be given to the conceded, but sometimes overlooked, potential for unfair prejudice that invariably accompanies the introduction of evidence of other bad acts." *Id.* In other words, given the high degree of potential unfair prejudice accompanying the improper admission of other bad acts evidence, as well as the understanding that "it will be the exceptional, and not the usual, case where the evidence of other bad acts is substantially relevant for reasons other than proof of criminal character," it is appropriate to place on the party offering the evidence "the burden of demonstrating relevance other than criminal character, as well as the burden of demonstrating that the probative value substantially outweighs the potential for unfair prejudice."[7] *Id.* at 500-01.

---

[7] The Appellate Court's majority opinion in this case purported to adopt the inclusionary approach that this Court rejected in *Harris*. *See Browne*, 2022 WL 17490062, at \*38. Neither party advocated for that approach at any stage of this litigation and both expressly rejected it before this Court. Lacking any evidence that the considered approach this Court adopted in *Harris* has proved unworkable or produced unjust results, and seeing no other reason to depart from it, we decline to do so. We therefore reaffirm that Maryland courts must approach questions concerning the admission of other bad acts evidence under Rule 5-404(b) using the exclusionary approach set forth in *Harris* and its progeny.

While confirming our use of the exclusionary approach in *Harris*, we also clarified that "admissibility of evidence of other bad acts is not confined to a finite list of exceptions." *Id.* at 497. To the contrary, *all* evidence with "sufficient relevance, other than merely by showing criminal character, may be admissible." *Id.* The "so-called exceptions" identified in the Rule are thus merely examples, honed over the course of centuries of development of this common law evidentiary principle, "of those areas where evidence has most often been found admissible even though it discloses other bad conduct." *Id.* at 497-98, 501; *see also McKinney v. State*, 82 Md. App. 111, 122 (1990) (describing the "exceptions" to the Rule as "a well established list of matters other than propensity that other crimes evidence may logically tend to prove"); Thomas J. Reed, *The Development of the Propensity Rule in Federal Criminal Causes 1840-1975*, 51 U. Cin. L. Rev. 299, 301-03 (1982) (stating that the earliest federal decision discussing the admissibility of evidence of other bad acts was decided in 1795 and noting that the rule tended to develop by the expansion of the judicial definition of each "exception" to the rule).

Under Maryland's exclusionary approach to other bad acts evidence, the proponent of such evidence must satisfy three requirements before it may be admitted: (1) the evidence must be specially relevant; (2) the defendant's involvement must be proved by clear and convincing evidence; and (3) the necessity for and probative value of the evidence must not be substantially outweighed by the risk of unfair prejudice. *Burris*, 435 Md. at 385-86; *Gutierrez v. State*, 423 Md. 476, 489-90 (2011). These requirements were first set forth in this Court's decision in *Faulkner*, 314 Md. at 634-35.

### 1. *Special Relevance*

The first *Faulkner* requirement is that the evidence must be "substantially relevant to some contested issue in the case" and "not offered to prove the defendant's guilt based on propensity to commit crime." *Faulkner*, 314 Md. at 634. When other bad acts evidence has substantial relevance to a contested issue other than propensity, it is said to have "special relevance." *Harris*, 324 Md. at 500; *Hurst v. State*, 400 Md. 397, 407-08 (2007). In other words, as summarized by Professor Lynn McLain, to have special relevance, other bad acts evidence "must be strongly probative of an issue other than character that is a significant issue in the case." 5 Lynn McLain, *Maryland Evidence: State and Federal*, § 404:5, at 760 (3d ed. 2013) ("McLain, *Maryland Evidence*").

As noted, Rule 5-404(b) lists examples of non-propensity purposes for which other bad acts evidence might be admitted as "exception[s] to the general rule of exclusion," *Harris*, 324 Md. at 501, including: "proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, [and] absence of mistake or accident[.]"[8] Md. Rule 5-404(b). Some of these examples "are phrased in terms of the immediate inferences sought to be drawn (such as plan or motive) while others are phrased in terms

---

[8] The second sentence of Rule 5-404(b) also provides that other bad acts evidence may be offered "in conformity with Rule 5-413." Unlike the other purposes identified in that sentence, however, Rule 5-413 permits introduction of specific other bad acts evidence—"evidence of other sexually assaultive behavior by the defendant"—for a propensity purpose. *See Woodlin v. State*, 484 Md. 253, 261-62 (2023); Md. Code Ann., Cts. & Jud. Proc. § 10-923(e) (2020 Repl.; 2023 Supp.) (permitting admission of "evidence of sexually assaultive behavior," under certain circumstances, to prove lack of consent or to rebut an allegation of fabrication by a minor victim).

of ultimate facts (such as knowledge, intent or identity) which the prosecution seeks to establish." 1 McCormick on Evid. § 190.1, 1148 (8th ed. 2020). As we have previously made clear, however, even where a purpose identified in the Rule is implicated, a court may not admit other bad acts evidence if the primary inference to be drawn from it depends on propensity reasoning. Thus, in *Harris*, we clarified that the identification of "intent" as a permitted purpose "does not mean . . . that whenever intent is an issue in a case, evidence of a prior bad act that is relevant to intent is automatically admissible. If the relevance of the prior bad act is limited to a showing of general criminal propensity, the evidence should be excluded." 324 Md. at 498.

This point is demonstrated by the ways in which prior bad acts evidence may permissibly be used to prove identity. In *Faulkner*, this Court identified ten different paths to the admission of other bad acts evidence under the identity exception. 314 Md. at 637-38. None rely upon propensity reasoning. Some allow for the introduction of evidence that directly connects the defendant to the crime or crime scene, such as proof of presence at the crime scene.[9] *See id.* Others concern direct proof of the defendant's identity itself, rather than identity as the perpetrator of the crime at issue, such as handwriting exemplars, mug shots, fingerprint records, or ballistics tests; remarks the defendant made; or the

---

[9] Other paths in this category include the defendant's membership in an organization with a purpose of committing crimes similar to the crime at issue; the defendant's prior theft of an object used in the crime; the defendant's possession of articles taken from the victim; the defendant's prior use of an alias or co-conspirator that was used in the crime at issue; and the defendant's prior wearing of clothing or use of objects that were worn or used by the perpetrator of the crime at issue. *Faulkner*, 314 Md. at 638.

17

witnesses' ability to identify the defendant based on having seen the defendant at another crime. *See id.* And one, which we will discuss in more detail below, permits a secondary inference of identity based on knowledge that the defendant was responsible for other crimes using the same "peculiar *modus operandi*" as was used in the crime at issue. *Id.* at 638. By contrast, when a defendant's identity as the perpetrator of the crime is the primary inference to be drawn from the defendant's commission of other bad acts, that is generally propensity reasoning.

Special relevance requires more than being "technically or minimally relevant"; in addition to pertaining to an issue other than propensity, the issue must be genuinely contested and the evidence must be substantially relevant to it. *Emory v. State*, 101 Md. App. 585, 602 (1994). Before admitting such evidence, a trial court must therefore determine that the issue to which the evidence is addressed is genuinely contested in that case and that the evidence has more than a minimal bearing on the issue. *See, e.g.*, *Wynn*, 351 Md. at 331 (holding that the circuit court erroneously admitted evidence of the defendant's possession of goods stolen in burglaries other than the one for which he was on trial where the defendant did not raise a defense of mistake or accident); *Emory*, 101 Md. App. at 604-21 (concluding that evidence of the defendant's prior drug-dealing activities was not admissible after reviewing potential non-propensity purposes for its admission and determining that the evidence either was not relevant to them or the potential issue was not genuinely in dispute); *McKinney*, 82 Md. App. at 125 (concluding that lack of accident was not genuinely at issue in a sexual assault case, notwithstanding the

18

defendant's testimonial admission that "it's possible" he may have inadvertently come in contact with victims in a crowded place, where the defendant otherwise denied the alleged acts occurred).

### 2. *Clear and Convincing Evidence*

If a trial court determines that the other bad acts evidence is specially relevant, the second requirement to admit the evidence under Rule 5-404(b) is that the accused's involvement in the other bad act(s) must be established by clear and convincing evidence. *Faulkner*, 314 Md. at 634.

### 3. *Weighing the Probative Value Against Possible Prejudice*

If the first two requirements are satisfied, the trial court must still weigh the necessity for and probative value of the evidence against the danger of unfair prejudice that would result from its admission. *Id.* at 635. If that danger substantially outweighs the necessity for and probative value of the evidence, the trial court should exclude it. Md. Rule 5-403; *Gutierrez*, 423 Md. at 490. "Underlying this prong of the test is the concern that other crimes or bad acts evidence 'is generally more prejudicial than probative.'" *Streater*, 352 Md. at 810 (quoting *State v. Taylor*, 347 Md. 363, 369 (1997)).

### B. *Standard of Review*

We evaluate the trial judge's determination with respect to each of the three *Faulkner* requirements using a different standard. The determination of special relevance—whether evidence is substantially relevant to a contested issue other than propensity—is a legal determination that we review without deference to the trial court.

*Faulkner*, 314 Md. at 634.  We review the trial judge's finding of clear and convincing evidence of the accused's involvement in other bad acts for sufficiency of the evidence. *Id.* at 635.  Finally, we review the trial judge's balancing of probative value against the danger of unfair prejudice for an abuse of discretion.  *Id.* at 635, 641.

## II. ADMISSIBILITY OF THE OTHER BAD ACTS EVIDENCE

Consistent with the *Faulkner* framework, we begin by determining whether evidence of Kendall's death was specially relevant to prove something other than Mr. Browne's propensity to commit the crimes for which he was tried.  The State argues that evidence of Kendall's death was relevant to two contested issues—identity and lack of accident—in three different ways:  (1) to show Mr. Browne's identity as Zaray's murderer based on a common *modus operandi* underlying the two crimes; (2) to show that Zaray's death was not an accident, which would in turn demonstrate Mr. Browne's criminal intent; and (3) to show the objective improbability that Mr. Browne would have been innocently associated with circumstances involving the murder of two infants by blunt force trauma.  We address each argument in turn.

### A.     *Identity and* Modus Operandi

The State first argues that the details of the crimes against Kendall and Zaray are so similar that they establish a common *modus operandi*, allowing the jury to infer, without resorting to any propensity reasoning:  (1) that the same person must have committed both crimes; and (2) because Mr. Browne pled guilty to causing Kendall's death, that he also murdered Zaray.

20

*Modus operandi* or "signature crime" evidence "is useful in *identifying* a defendant who claims that he was not the person who committed the crime." *Hurst*, 400 Md. at 414. The theory underlying the introduction of other bad acts evidence to prove the use of a *modus operandi* is that "there is some clear connection between [the uncharged] offense and the one charged so that it may be logically inferred that if [the] defendant is guilty of one[, the defendant] must be guilty of the other." *Moore v. State*, 73 Md. App. 36, 41 (1987) (quoting *People v. Haston*, 444 P.2d 91, 99 (Cal. 1968)). *Modus operandi* evidence thus supports a primary inference that the charged offense shares such common, signature features with the uncharged offense(s) that "they may be said to be the work of the same person." *Hurst*, 400 Md. at 415. A secondary inference, when evidence that the defendant committed the uncharged offense(s) is added to the evidence tying the offenses together, is that the defendant also committed the charged offense. Establishing a *modus operandi* thus provides a path to the introduction of other bad acts evidence to prove identity that is not premised on propensity reasoning.

To establish a *modus operandi*, the crimes at issue must be "so nearly identical in method as to earmark them as the handiwork of the accused." *Faulkner*, 314 Md. at 638 (quoting *McKnight v. State*, 280 Md. 604, 613 (1977)). We have said, for example, that "[t]he device [used to commit the crime] must be so *unusual and distinctive* as to be like a signature." *Id.* (alteration in *Faulkner*).

Evidence regarding a *modus operandi* "should be considered as a whole, instead of as a set of unrelated parts." *Faulkner*, 314 Md. at 639. Thus, features of a crime that may

21

be ordinary when considered alone can still establish a *modus operandi* when considered in combination. *Id.*; *see also Garcia-Perlera v. State*, 197 Md. App. 534, 548-49 (2011) (finding a *modus operandi* among four home invasions within a year of elderly women living alone, each within walking distance of the other, on weekdays between Monday and Wednesday, all gagged and "hog-tied," with three of the victims detained in their basements); *Oesby v. State*, 142 Md. App. 144, 155-57 (2002) (finding a *modus operandi* among four attacks over the course of nine days on women living near each other in the common areas of their apartments where the attacker approached the victims in a friendly manner before raping them while wielding a knife with specific characteristics); *Moore*, 73 Md. App. at 42-44, 47-48 (finding a *modus operandi* where three women were attacked within a month of one another, all crimes occurred between 11:45 a.m. and 1:30 p.m., the assailant in all demanded or took jewelry from the victim's purse, all three occurred near the same Metro station, all victims were choked, and in all, the attacker initiated the encounter by showing the victims a photo and asking for directions).

On the other hand, simply showing common elements of charged and uncharged crimes is insufficient; the common elements must mark the offenses as sufficiently consistent and extraordinary as to indicate that they must both have been undertaken by the same individual. Thus, for example, in *McKnight*, we found insufficient evidence of a *modus operandi* where four victims of different robberies that occurred within a one-month period were all men living alone in the same neighborhood, in a thickly populated urban area, and three of the men had their pants ripped during the crimes. 280 Md. at 613-14.

22

We explained that the similarities among the crimes were not sufficiently distinctive to amount to a *modus operandi*. Instead, "[s]uch similarities . . . 'fit into an obvious tactical pattern which would suggest itself to almost anyone disposed to commit a depredation of this sort.'" *Id.* at 614 (quoting *United States v. Foutz*, 540 F.2d 733, 737 (4th Cir. 1976)); *see also Hurst*, 400 Md. at 415 (finding no *modus operandi* in the cases of two women who were sexually assaulted by a perpetrator who approached the victims seeking directions and then traveled with them to secluded areas and attacked them, where the assaults occurred 21 years apart in different cities, the perpetrator was the driver in one incident and a passenger in the other, and there were other differences); *Brown v. State*, 85 Md. App. 523, 536 (1991) ("[T]he indicated inference [of *modus operandi*] does not arise . . . from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than the defendant." (quoting *Moore*, 73 Md. App. at 41) (alteration in *Brown*)).

Here, the State argues that the deaths of Kendall and Zaray shared the following characteristics that amount to a distinctive signature: Kendall and Zaray were both preverbal babies who could not tell adults about their abuse; each was the youngest of multiple siblings; each died following one of the only occasions they had been left alone with Mr. Browne; each died of blunt force trauma; and Mr. Browne blamed the victims' older siblings after each death. We share Judge Arthur's assessment of this evidence:

23

Certainly, these two horrific crimes share a generic resemblance with each other: both are forceful beatings directed at the upper half of an infant child's body by an adult. Yet "[t]here is nothing particularly unusual or distinctive" about the overlapping features. *Lebedun v. State*, 283 Md. 257, 281 (1978). As noted in Browne's appellate brief, blunt-force trauma to an infant is, unfortunately, far from a unique cause of death. Examples of similar crimes are not difficult to find. *E.g.*, *Pinkney v. State*, 151 Md. App. 311, 317 (2003) (describing death of six-month-old child caused by multiple blunt-force injuries to the head); *Robey v. State*, 54 Md. App. 60, 68 (1983) (describing death of 10-month-old child caused by multiple blunt-force injuries to the chest and abdomen). The fact that both crimes occurred outside the view of witnesses is a common feature of physical child abuse, not the type of similarity that tends to establish a distinctive signature. *See Lebedun*, 283 Md. at 281-82; *Cross v. State*, 282 Md. [468,] 475-76 [1978]; *McKnight*, 280 Md. at 614; *Brown*, 85 Md. App. at 537.

. . .

Unlike the evidence in cases cited by the State, the other-crimes evidence here does not involve close proximity of location and time, matching descriptions of the perpetrator, or the repeated use of a particular method of committing the crime. Here, the charged crime and the prior crime were committed against similar victims, apparently in a similar manner, six years apart. Overall, it cannot be said that these two crimes were "so nearly identical in method as to earmark them as the handiwork" of a singular perpetrator or "so unusual and distinctive as to be like a signature." *McKnight*, 280 Md. at 613. The degree of similarity is not enough to support the inference that the same person probably committed both crimes. *See Hurst*, 400 Md. at 415; *Lebedun*, 283 Md. at 281; *McKnight*, 280 Md. at 613-14; *Brown*, 85 Md. App. at 537.

*Browne*, 2022 WL 17490062, at *58 (Arthur, J., dissenting).

Ultimately, we cannot say that a reasonable person presented with the facts surrounding these two crimes—without knowing the identity of Mr. Browne as the perpetrator of one of them and a suspect in the other—would have concluded that the same person likely committed both. The State's *modus operandi* theory of admission thus fails.

24

### B.     *Lack of Accident*

The State next argues that the evidence of Kendall's death was specially relevant to show that Zaray did not die as a result of an accident, which it claims also proves Mr. Browne's criminal intent. Mr. Browne maintains, as he did in response to the motion in limine, that absence of accident is not an issue in genuine dispute because it is undisputed that Zaray's injuries were inflicted by a person and that the person who did so intended to hurt Zaray. We agree with Mr. Browne.

The "absence of mistake or accident" theory of admission of other bad acts evidence encompasses two distinct but related (and sometimes conflated) theories. Absence of mistake is applicable when a defendant acknowledges taking the action that resulted in harm to the victim but contends that it was the product of a mistake, rather than an intentional act. *See Wynn*, 351 Md. at 325; *see also* McLain, *Maryland Evidence*, § 404:12, at 803 ("If the defendant admits that [the defendant] took an action, but claims to have done so unintentionally or by mistake, . . . the prosecution may offer evidence of the defendant's similar prior wrongs, acts, or crimes, to prove absence of mistake . . . ."). Absence of accident, by contrast, is applicable when the State seeks to negate a claim that the harm the defendant is accused of inflicting resulted from an independent accident and not from *any* act of the defendant, purposeful or otherwise. *Emory*, 101 Md. App. at 609; *see also* McLain, *Maryland Evidence*, § 404:12, at 804 ("The defendant may claim that the harm [the defendant] is alleged to have caused was not at [the defendant's] hands, but was the

25

result of an independent accident. Evidence of prior similar acts by the defendant is then admissible to show lack of accident.").[10]

Critically here, however, neither theory of admission is applicable in the absence of a defense or assertion of mistake or accident to rebut. In *Wynn*, for example, this Court considered a purported absence of mistake theory in a robbery prosecution in which the defendant claimed to have come into possession of goods he was accused of stealing by innocently purchasing them at a flea market. 351 Md. at 318-19, 331. We ultimately concluded that neither mistake nor accident applied because the defendant never invoked either. *Id.* at 331-32.[11] Surveying cases from Maryland and other jurisdictions, we observed that "for the exception to apply, the defendant generally must make some assertion or put on a defense that [the defendant] committed the act for which [the defendant] is on trial, but did so by mistake." *Id.* at 330-31. Because the defendant in *Wynn* had done neither, the absence of mistake or accident exception to the rule against admission of other bad acts evidence did not apply. *Id.* at 331.

---

[10] Contributing to the confusion in some caselaw between absence of mistake and absence of accident is the common English usage of "accident" to cover what Rule 5-404(b) treats separately as "mistake" and "accident." *See, e.g.*, *Accident*, *Merriam-Webster's Collegiate Dictionary* 7 (11th ed. 2014) (defining "accident" as including, among other definitions, "an unforeseen and unplanned event or circumstance," "lack of intention or necessity," and "an unfortunate event resulting esp. from carelessness or ignorance").

[11] In *Wynn*, the majority opinion separately identified the two "factual scenarios" underlying absence of mistake and absence of accident, but used the phrase "absence of mistake" to cover them both. 351 Md. at 325-26.

26

In *Emory*, the Appellate Court engaged in similar reasoning in rejecting absence of mistake or accident as a theory supporting the admissibility of evidence of uncharged narcotics-related activities in a prosecution for drug kingpin conspiracy and related offenses. 101 Md. App. at 608-09. Because the defendants "never argued that their apparent involvement with marijuana was somehow an inadvertent and bizarre mistake," the court held that "[t]here was . . . no claim, proffer, or theory of mistake that needed to be negated," and so the evidence was not admissible on that basis. *Id.*; *see also McKinney*, 82 Md. App. at 125 (reversing admission of other bad acts evidence on absence of mistake theory where court concluded that the defendant had "never asserted a defense of accident or mistake").

Here, Mr. Browne neither made any assertion nor raised any defense to make absence of accident an issue in genuine dispute at trial. In his written response to the State's motion in limine concerning other bad acts evidence, Mr. Browne's counsel observed that the absence of accident exception applied only when the defendant admitted engaging in the act at issue but claimed "that he did so accidentally or by mistake," and argued that Mr. Browne "has made and is making no such assertion and raising no such defense." Mr. Browne specifically disavowed any intent to argue that Zaray "might have sustained significant injury" as a result of the fall from the playground slide. In later arguing the motion, Mr. Browne's counsel reiterated that "we're not asserting a defense of accident or mistake and I don't think his recounting of [the fall from the slide] rise[s] to the level of an assertion of accident or mistake in his own statement, Your Honor."

27

At trial, consistent with those representations, Mr. Browne made no assertion of accident and raised no defense of accident. Indeed, Mr. Browne's own medical expert agreed with the State's medical expert that the manner of death was homicide and that the cause of death was "[b]lunt force injuries." The defense's expert further agreed with most of the findings of the autopsy report on which the State relied, including that Zaray had sustained acute injuries shortly before he died that were the cause of death, along with older injuries that were not. The main points of disagreement between the experts concerned the timeframes over which the respective injuries might have occurred, as Mr. Browne's primary defense strategy was to argue that they were inflicted at times when someone besides Mr. Browne could have inflicted them. In other words, Mr. Browne argued neither that an independent accident caused Zaray's fatal injuries nor that he inflicted those injuries by mistake. He effectively conceded that someone had intentionally inflicted Zaray's injuries but argued that the someone was not him.

The State makes two arguments to support its contention that there was a genuine dispute regarding absence of accident.[12] First, the State contends that Mr. Browne placed

---

[12] In its brief, the State suggests in passing that the other bad acts evidence may have been relevant to prove absence of mistake in addition to absence of accident. It states that agreement by the medical experts that Zaray's death was a "homicide" indicates that Zaray's death could have been a death caused by a person "and also an accident." The State goes on to argue that "[i]f, purely for sake of argument, . . . Browne . . . had inadvertently injured Zaray, but had no criminal intent, his death would have been a homicide, but not a criminal one. Accordingly, the State was entitled to present evidence of Kendall's death to rebut the possibility that Zaray's death was an accidental, non-criminal homicide." That "absence of mistake" argument suffers the same fate as the

28

lack of accident at issue: (1) by telling police, in a recorded statement that the State later played for the jury, that Zaray fell off the slide the day he died; and (2) via defense counsel's statement in closing argument that Zaray was injured at the playground. Neither contention is supported by the record. Although Mr. Browne, in recounting the events that occurred on the day of Zaray's death in his recorded statements, included Zaray's fall from the slide, neither he nor any other witness attributed any of Zaray's injuries, much less his death, to the fall. And the statement from closing argument on which the State relies, viewed in context, does not invoke Zaray's fall from the slide at all. Although defense counsel's statement referenced the playground as the location where Zaray and Mr. Browne were before Zaray vomited for the first time, it did so in the course of pointing out that the detective investigating the case had been visiting the wrong playground until a month before trial.[13] Defense counsel's focus was on the quality of the police investigation, not Zaray's fall from the slide.

_____

State's more prominent "absence of accident" argument because neither mistake nor accident was genuinely at issue at trial.

[13] The statement at issue is:

> [DEFENSE COUNSEL]: So, what does [the detective] do in December three months after the second interviews of the children, he goes where? He goes back to the wrong playground. Surely by now, with all of these interviews and all this opportunity to do a follow-up investigation to determine the right playground. And why is it important? Because, if you look at the time line at least from the detective's point of view and the State's point of view, Zaray Gray vomits for the first time at 11:00 a.m. And so whatever might have happened to Zaray Gray would have likely have happened, at least

29

Second, the State contends that absence of accident was genuinely at issue because the State, in every case, bears the burden of proof beyond a reasonable doubt as to every element of the crime, including intent, and Mr. Browne never expressly conceded absence of accident. Taken to its logical conclusion, the State's argument would permit it to introduce other bad acts evidence to disprove every conceivable defense a defendant might raise that the defendant had not expressly conceded. That contention is inconsistent with our caselaw, which, as discussed above, permits the introduction of other bad acts evidence to show absence of mistake or accident only when it is *genuinely* at issue. *See, e.g.*, *Wynn*, 351 Md. at 330-31 ("[F]or the exception to apply, the defendant generally must make some assertion or put on a defense that [the defendant] committed the act for which [the defendant] is on trial, but did so by mistake."); *Boyd v. State*, 399 Md. 457, 484-85 (2007) (declining to admit other bad acts evidence to show absence of mistake where the defendant "has never asserted or defended on the ground that [the defendant's] conduct . . . was permitted or was based on a mistake or mistaken belief"); *Hurst*, 400 Md. at 410-11 (holding that where consent was the only contested issue in the case, and the Court concluded that "[e]vidence that a third party did not consent to sexual intercourse . . . in the past" was not relevant to whether the victim in this case "consented to sexual activity," evidence of the prior crime was inadmissible propensity evidence).

initially, before that. And where were they before that? The playground. And the detective is not looking or doesn't care about looking beyond the 18th of July. He's just focusing on the 18th of July. So let's get the right playground.

The State relies on *State v. Taylor*, 347 Md. 363, 374-75 (1997), for the proposition that a defendant's decision not to contest an element of the offense does not relieve the prosecution of its burden to prove each element of the crime beyond a reasonable doubt. That proposition is of course true. But when the issue is the admissibility of other bad acts evidence, whether a matter is genuinely contested must be determined in the context of the evidence presented and the arguments made. In *Taylor*, for example, we considered the consolidation of five charges of physical child abuse in a single trial. 347 Md. at 366-67. In holding that evidence of each incident of alleged physical child abuse was admissible in the trials of the others, such that it was not error to consolidate the charges, we observed that we had previously "recognized the relevance of intent and malice in child abuse cases," which "can be critical in distinguishing permissible parental corporal punishment from criminal child abuse." *Id.* at 370. In such cases, "often the only way to determine whether the punishment is a non-criminal act of discipline that was unintentionally harsh or whether it constitutes the felony of child abuse is to look at the parent's history of disciplining the child." *Id.* at 377. In that case, there was no dispute concerning the identity of the perpetrator; the only issues were whether the child was fabricating his claims and whether the defendant was engaged in permissible disciplinary acts. *Id.* at 372. Thus, notwithstanding that the defendant, who did not testify, did not expressly raise a defense of lack of intent or malice, the other bad acts evidence at issue had special relevance in the context of that case. *Id.*

31

Here, unlike in *Taylor*: (1) the defense expressly disavowed any argument of mistake or accident;[14] and (2) the evidence presented at trial essentially precluded any possibility of mistake or accident. The fact and expert testimony at trial all established that Zaray was murdered by blunt force trauma from repeated blows inflicted by an adult, with the fatal injuries inflicted either on the day of his death or the day before, and additional blunt force injuries inflicted before that. The only question at trial was whether Mr. Browne, as opposed to another person, intentionally inflicted the fatal injuries. Because lack of accident was not genuinely contested, evidence of Kendall's death was not specially relevant for that purpose.

### C.    *The Doctrine of Chances*

The final theory of special relevance upon which the State relies is the doctrine of chances, which is a theory that this Court has not previously adopted. The State claims that, by use of the doctrine, evidence of Kendall's death was properly admitted to permit the jury to infer Mr. Browne's responsibility for Zaray's death due to the objective improbability of him being innocently enmeshed in suspicious circumstances surrounding the deaths of two infants. As we shall explain, while the doctrine may be a useful theory

---

[14] We do not suggest that the defense disavowing an intent to rely on a particular defense is dispositive. Such a disavowal would be ineffective in precluding the admission of other bad acts evidence if, for example, it is inconsistent with evidence or argument that implicates such a defense. And if the inconsistency arises in a trial in which other bad acts evidence was previously excluded, the court, upon the State timely raising the issue, should explore how to alleviate the prejudice to the State.

to invoke in other circumstances, here, it served merely as a cover for impermissible propensity-based reasoning.

The doctrine of chances, as described and used by commentators and some other courts, concerns the objective improbability of a certain event occurring more than once with innocent explanations.  Edward J. Imwinkelried, *An Evidentiary Paradox:  Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, the Doctrine of Chances*, 40 U. Rich. L. Rev. 419, 423 (2006).  When presented with a series of unlikely, repeated events, the doctrine "represents a permissible path to one factual inference:  Based on the objective improbability that uncommon events will happen repeatedly by chance, a factfinder may reasonably infer that one or some events in a group of unlikely events were not the result of chance."  *State v. Jackson*, 498 P.3d 788, 802 (Or. 2021); *see also Westfield Ins. Co. v. Harris*, 134 F.3d 608, 615 (4th Cir. 1998) ("[The] doctrine posits that the more often an accidental or infrequent incident occurs, the more likely it is that its subsequent reoccurrence is not accidental or fortuitous.").

Dean John Wigmore's quintessential example of the doctrine's reasoning illustrates that inferential path:

> [I]f A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim or B's accidental tripping as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (*i.e.* as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small . . . .

33

1 John Henry Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law*, § 302, at 611-12 (2d. 1923). As in that example, the doctrine is often used to show absence of mistake, allowing from the repeated occurrence of uncommon events the inference that a defendant had the requisite intent when committing the action of a crime and did not act inadvertently. Edward J. Imwinkelried, *A Brief Essay Defending the Doctrine of Objective Chances as a Valid Theory for Introducing Evidence of an Accused's Uncharged Misconduct*, 50 N.M. L. Rev. 1, 10-11 (2020) ("Imwinkelried, *Brief Essay*").

Some courts have also approved of the doctrine as a means to show absence of accident, permitting the inference that an event occurred not by independent accident, but rather by human action, because it is unlikely that the event would occur frequently without human intervention. *Id.* at 9-10. A classic example of that reasoning is in *United States v. Woods*, 484 F.2d 127, 135 (4th Cir. 1973). In *Woods*, the defendant was on trial for the murder of her 8-month-old, pre-adoptive foster child, who was healthy when placed with the defendant, but then suffered a series of episodes of cyanosis, a condition related to deprivation of oxygen in the blood, and eventually died.[15] *Id.* at 129-30. During the trial, the government was permitted to introduce evidence that nine other children who were otherwise healthy suffered episodes of cyanosis while in the defendant's care, with seven of them dying. *Id.* at 130-31. In a 2-1 decision, the court upheld the decision to admit the

---

[15] "Cyanosis is the medical term for when your skin, lips or nails turn blue due to a lack of oxygen in your blood." Cleveland Clinic, *Cyanosis*, available at https://my.clevelandclinic.org/health/diseases/24297-cyanosis (last accessed Nov. 1, 2023), *archived at* https://perma.cc/SPT9-G99C.

evidence. *Id.* at 133-35. The court reasoned that although there was insufficient evidence of the defendant's guilt with respect to any child when the incidents were viewed independently, when the evidence considering all of the incidents was viewed collectively, it showed "that the probability that some or all of the other deaths, cyanotic seizures, and respiratory deficiencies were accidental or attributable to natural causes was so remote, the truth must be that [the victim] and some or all of the other children died at the hands of the defendant." *Id.* at 133.

The majority "conclude[d] that the evidence was admissible generally under the accident and signature exceptions," but went further, grounding its holding on the broader rationale of "the remoteness of the possibility that so many infants in the care and custody of defendant would suffer cyanotic episodes and respiratory difficulties if they were not induced by the defendant's wrongdoing." *Id.* at 134-35. Moreover, the court reasoned, because that same rationale led directly to the defendant, it also stood to "prove the identity of defendant as the wrongdoer." *Id.* at 135. Establishing the identity of the defendant as the perpetrator of the crime was thus the secondary inference established by the pattern of improbable episodes. *Id.* at 134-35.

This Court has not previously had the opportunity to assess whether to adopt the doctrine of chances as an independent basis for the special relevance of other bad acts evidence. Judge Irma Raker engaged in a thorough exploration of the doctrine in a dissent

in *Wynn*, 351 Md. at 343-47 (Raker J., dissenting), and encouraged its adoption,[16] but the majority declined to address the issue on preservation grounds, *id.* at 319 (majority op.). In his dissent in this case, Judge Arthur did not reject the potential usefulness of the doctrine in supporting the basis for inferences such as absence of mistake or accident, but he viewed the doctrine as "not an independent ground upon which to admit other acts evidence." *Browne*, 2022 WL 17490062, at \*64 (Arthur, J., dissenting) (quoting *State v. Atkins*, 819 S.E.2d 28, 37 (Ga. 2018)).

Without determining the specific circumstances in which the doctrine of chances might be useful in proving special relevance, we agree with Judge Arthur that in this case, "the State stretched the doctrine of chances beyond its limits." *Browne*, 2022 WL 17490062, at \*69 (Arthur, J., dissenting). That is because where the doctrine is applicable, "[t]he only warranted inference . . . is that one or some of the incidents are likely not accidents." Imwinkelried, *Brief Essay* at 10. As in *Woods*, that permissible primary inference can then lead to a secondary inference identifying the defendant as the

---

[16] In *Wynn*, the State sought to introduce evidence of the defendant's possession of goods stolen in multiple robberies during his prosecution for one of the robberies, arguing that the evidence was specially relevant to prove absence of mistake. 351 Md. at 318-19. Judge Raker concluded that the evidence was "perhaps better, and more intuitively, explained by the doctrine of chances[.]" *Id.* at 343. As applied there, Judge Raker explained that the defendant's "possession of the [goods stolen in other robberies] was offered by the State to prove that [the defendant's] claim of innocent possession of the goods stolen [in the robbery at issue] was not worthy of belief." *Id.* at 345-46. Judge Raker would have held the evidence admissible based on the doctrine of chances because the "intermediate inference permissibly tended to establish an ultimate fact at issue in this case; *i.e.*, the circumstances by which [the defendant] came into possession of the goods stolen [in the robbery at issue]." *Id.* at 346.

perpetrator. *See, e.g.*, *People v. Weeks*, 369 P.3d 699, 705-06 & n.7 (Colo. App. 2015) (holding that where the defendant claimed a child died from accidental injuries, evidence of other bad acts was admissible to show that the child did not die by accident, allowing a secondary inference that the defendant committed the act). Thus, as we explained in *Cross v. State*, "a need for proving identity is not ordinarily of itself a ticket of admission, but . . . the evidence will usually follow, as an intermediate channel, some one or more of the other [exceptions]." 282 Md. 468, 476 (1978) (alteration in *Cross*) (quoting McCormick on Evidence, § 190, at 451 (2d ed. 1972)). In other words, proving that the accused had a motive or plan to commit a crime, or used the same distinct signature in another crime that was present in the charged crime, can allow the secondary inference that it is more likely that the accused, and not someone else, committed the charged crime. *Id.* at 477.

But where, as here, the State seeks to introduce evidence to show that because the defendant was previously convicted of a similar intentional act, it is objectively unlikely that the defendant is not responsible for the intentional act at issue, that is propensity reasoning.[17]

---

[17] We are unaware of any case in which a court has approved the use of the doctrine of chances to establish a primary inference of identity. The State offers quotes from two cases that it claims support such an inference, but the doctrine was not used for that purpose in either case. In one, *People v. Balcom*, the majority held that evidence of prior bad acts was admissible "to support the inference that the uncharged acts and the charged offense are manifestations of a common design or plan." 867 P.2d 777, 784 (Cal. 1994). The quote on which the State relies comes from a concurring opinion in which one justice postulated corroboration of a witness's testimony as an alternative basis for admission. *See id.* at 785 (Arabian, J., concurring). In the other, *People v. VanderVliet*, the testimony at issue was

37

Shorn of any utility to demonstrate a *modus operandi* or absence of accident—neither of which apply as explained above—evidence of Kendall's death would be relevant only to permit the jury to infer that because Mr. Browne was responsible for Kendall's death, he more than likely murdered Zaray; i.e., that Mr. Browne had a propensity to harm young children. The circuit court therefore abused its discretion in admitting evidence of Kendall's death. Accordingly, we will reverse the judgment of the Appellate Court and remand to that court with instructions to remand the case to the Circuit Court for Baltimore City for a new trial.

### III. OTHER CONTENTIONS

In addition to his contention that the Appellate Court erred in upholding the circuit court's admission of evidence concerning Kendall's death, Mr. Browne argues that the intermediate appellate court erred or abused its discretion in affirming the circuit court's denial of his motion for a new trial based on the discovery that two unadmitted videos were mistakenly included on a disk that was provided to the jury along with properly admitted evidence. Mr. Browne contends that the Appellate Court erred in its assessment of whether his trial counsel acted with due diligence in discovering the error. Because we are already remanding this case for a new trial, and because it is unlikely that the mistake concerning

---

offered "to make it objectively less probable that the defendant acted with innocent intent in [another] case." 508 N.W.2d 114, 128 (Mich. 1993). The opinion of the Michigan high court does not suggest that the doctrine of chances could be employed to support a primary inference of identity.

the submission of unadmitted videos to the jury will recur on remand, we decline to resolve

Mr. Browne's contentions concerning the denial of his motion for a new trial.

**CONCLUSION**

In sum, we hold that evidence of the death of Mr. Browne's infant child was not offered for a permissible purpose that was relevant to a disputed issue in the State's prosecution of Mr. Browne for the death of Zaray Gray. Accordingly, the circuit court abused its discretion in admitting the evidence, and the Appellate Court erred in affirming the circuit court's judgment.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED AND CASE REMANDED WITH INSTRUCTIONS TO REVERSE AND REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE APPELLATE COURT OF MARYLAND TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

Circuit Court for Baltimore City
Case No. 118232001

Argued: September 8, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 2

September Term, 2023
_____

FRANCOIS BROWNE

v.

STATE OF MARYLAND
_____

Fader, C.J.
Watts
Hotten
Booth
Biran
Gould
Eaves,

JJ.
_____

Dissenting Opinion by Watts, J.
_____

Filed: November 28, 2023

Respectfully, I dissent. I agree with much of the majority opinion, but not the result. I agree with the Majority that the doctrine of chances does not render admissible, in this case, evidence that Francois Browne, Petitioner, engaged in physical child abuse of Kendall Browne, his 7-month-old biological son, resulting in Kendall's death and Mr. Browne entering an *Alford* plea to first-degree child abuse resulting in death. See Maj. Slip Op. at 36-37. Specifically, I agree with Judge Arthur that the doctrine "is not an independent ground upon which to admit other acts evidence[.]" Francois Browne v. State, No. 495, Sept. Term, 2021, 2022 WL 17490062, at *64 (Md. Ct. Spec. App. Dec. 7, 2022) (Arthur, J., dissenting) (cleaned up). I also agree with the Majority that Mr. Browne never raised the defense of accident at trial and that, therefore, evidence related to Kendall's death would not fit within the "absence of mistake or accident" exception to the prohibition on evidence of other acts under Maryland Rule 5-404(b). See Maj. Slip Op. at 32.[1]

Where I part ways with the Majority is on the issue of whether the evidence of Kendall's death was admissible under Maryland Rule 5-404(b) to establish identity. I would hold that it was.[2] Although the Appellate Court did not provide any analysis on the

---

[1]In addition, I agree with the Majority that, based on the result that it reaches, it need not address the denial of the motion for a new trial based on the availability to the jury of unadmitted videos. See Maj. Slip Op. at 38-39.

[2]I would also conclude that the circuit court did not abuse its discretion in denying Mr. Browne's motion for a new trial, given that there is no evidence whatsoever that the jury ever viewed the videos that were mistakenly included on the State's compact disc that had been admitted into evidence. I agree with the Appellate Court that "there was no indication that the jury was even aware of the fact that the disc contained two other conversations that had never been introduced in evidence." Browne, 2022 WL 17490062, at *46. In light of the outcome reached by the Majority, it is unnecessary to spill a great deal of ink on the point.

point, it reached the correct result in determining that evidence of Kendall's death was admissible to show identity. Accordingly, for this reason only, I would affirm the judgment of the Appellate Court, which affirmed Mr. Browne's convictions. See Browne, 2022 WL 17490062, at *50.

It is not necessary to repeat in detail the Majority's summary of the State's observations regarding the similarities between Zaray's and Kendall's deaths or the Majority's explanation of the law governing the "identity" exception to the prohibition on evidence of other acts under Maryland Rule 5-404(b). See Maj. Slip Op. at 20-24. Both are accurate. It suffices to say that the "identity" exception under Maryland Rule 5-404(b) may apply where the other acts establish a *modus operandi* by being "so nearly identical in method as to earmark them as the handiwork of the accused" and "so unusual and distinctive as to be like a signature." State v. Faulkner, 314 Md. 630, 638, 552 A.2d 896, 900 (1989) (cleaned up).

In my view, a person viciously beating to death a child, who is left in the person's care, when the person is alone with the child, is unusual and distinctive behavior. The material circumstances surrounding Zaray's and Kendall's deaths were horrific and so nearly identical that it would be reasonable to infer that they earmark both deaths as Mr. Browne's work. In both cases, the victim was less than two years old, preverbal, and, at the relevant time, was not only in Mr. Browne's exclusive care and custody, but also alone with him. In this case, Zaray's brother testified that, at one point, after leaving, he tried to get back into the house, but the front door was locked, and he looked through the window and saw Mr. Browne sitting on the couch and watching TV, with Zaray asleep in his lap.

Similarly, as far as the record in this case reveals, Mr. Browne was alone with Kendall until paramedics arrived and found Kendall in full cardiac arrest.

In both cases, there was evidence indicating that Mr. Browne was mad, upset, or frustrated at the time that the offenses occurred. In this case, Zaray's siblings' testimony indicated that, on the day of Zaray's death, on the way home from the playground, Mr. Browne had been frustrated with Zaray for repeatedly falling down and that he yanked Zaray's arm so hard that Zaray cried. Similarly, Zaray's mother testified that, when telling her about Kendall's death, Mr. Browne said that the State alleged that, after a football game between the Dallas Cowboys and the team now named the Washington Commanders, "he got mad and upset and beat his son to death."

In both cases, the manner of death was homicide, and both children suffered blunt force trauma to both the head and torso. In addition, both children incurred other injuries that were similar. Both children had bone fractures, internal injuries, contusions (*i.e.*, bruises), and scrapes or abrasions.

In each case, there was evidence that Mr. Browne had been mad or upset and was alone with a child less than 2 years old, and then beat the child so badly that the child died as a result. Despite the similarities between Zaray's and Kendall's deaths, the Majority states that no "reasonable person presented with the facts surrounding these two crimes—without knowing the identity of Mr. Browne as the perpetrator of one of them and a suspect in the other—would have concluded that the same person likely committed both." Maj. Slip Op. at 24. The Majority seems to look at the *modus operandi* analysis in a vacuum, as if there were an untold number of people who could have been responsible for both

crimes. In most child assault cases, there will be only a small set of people who could be responsible for the charged offenses. Approaching the analysis as if there could be an untold or infinite number of people potentially culpable presents a disconnect from the reality of these type of physical child abuse crimes.

The facts of this case include the circumstance that there was an extremely narrow set of people who had access to Zaray around the time of his death and thus could have been responsible for his fatal injuries—namely, Mr. Browne, Zaray's siblings (who were only 7 and 9 at the time of trial), and his biological parents (though there is no evidence that his biological father was with him in the hours leading up to his death). Given this extraordinarily small group of people who could have potentially been identified as responsible for Zaray's fatal injuries, the similarities between his death and Kendall's were highly probative of, and directly went to, Mr. Browne's identity as the member of the group who was the perpetrator.

This is not a case in which the State tried to establish a *modus operandi* so vague that it could be used to identify anyone in the general population as the guilty party, which seems to underpin the Majority's conclusion that Kendall's death was not admissible to establish Mr. Browne's identity as the one responsible for Zaray's death. See Maj. Slip Op. at 24. Unlike in a murder case involving, for instance, a nighttime break-in at a residence, in this case, not just anyone could have caused Zaray's fatal injuries. To the contrary, Zaray's death could have been caused only by someone who had exclusive care or custody of him—*i.e.*, someone who was left alone with him—around the time of his death. Given that, at most, only five people fit that description (and two of them were

- 4 -

young children), the fact that one of those individuals—namely, Mr. Browne—was convicted of physical child abuse resulting in death under extremely similar circumstances takes on a special relevance.

I am troubled by the possibility that, in future physical child abuse cases, the majority opinion could be taken to mean that the circumstances of a defendant having been alone with another child or children who ended up dying by similar means as the victim at issue cannot be factors that establish a *modus operandi*, regardless of how few people had access to the victim at issue around the time of the victim's death. In my view, the smaller the number of individuals who had access to the child at the relevant time, the more probative it is that one of those individuals was previously alone with, and then fatally injured, another child in a similar manner.

I would conclude that evidence of Kendall's death was relevant to establish a *modus operandi* and supported an inference that the conduct in the prior case shared distinctive and unusual features with the offenses charged in this case. I would conclude that the probative value of the evidence outweighed the danger of unfair prejudice. The probative value of the evidence of Kendall's death was extremely high, given the similarities between Zaray's and Kendall's deaths. In addition, the circuit court mitigated the risk of unfair prejudice by giving limiting instructions twice—first before there was testimony about Kendall's death, and again after the conclusion of the evidentiary phase of the trial.

In sum, I cannot join the Majority's reasoning that the similarities between Zaray's and Kendall's deaths were not specific enough to identify Mr. Browne as the one responsible for Zaray's fatal injuries. See Maj. Slip Op. at 24. Simply put, evidence of the

deaths of two young children who experienced similar devastating injuries while alone with Mr. Browne, who had been mad or upset around the time, was sufficient to establish a *modus operandi*.

For the above reasons, respectfully, I dissent.